1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10    BRIAN DARNELL EDWARDS,

11              Plaintiff,                    No. 2:10-cv-3461 WBS KJN P

12         vs.

13    HIGH DESERT STATE PRISON, et al.,

14              Defendants.              FINDINGS AND RECOMMENDATIONS

15    _____/

16    I.  Introduction

17              Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to

18    42 U.S.C. § 1983.  This case is proceeding on the amended complaint, filed March 21, 2011.

19    Plaintiff alleges that defendants Turner-Gamberg, Cheney, Mitchell and Swingle[1] were

20    deliberately indifferent to plaintiff's medical needs, defendants were negligent, and defendant

21    Turner-Gamberg violated plaintiff's First and Fourth Amendment rights.  On March 23, 2012,

22    defendants filed a motion for summary judgment.  As explained below, the court recommends

23    that defendants' motion for summary judgment be granted.

24    ////

25    _____

26         [1]  The court dismissed defendant McDonald on August 26, 2011.  (Dkt. No. 27.)

II.  <u>Plaintiff's Allegations</u>

Plaintiff is proceeding on the verified amended complaint filed March 21, 2011. (Dkt. No. 13.)  Plaintiff alleges that on December 23, 2008, he informed Correctional Officer Ngard, while Ngard was picking up dinner trays, that plaintiff needed a breathing treatment. Plaintiff alleges that defendant Mitchell denied plaintiff medical treatment for over two and a half hours on December 23, 2008.  (<u>Id.</u> at 5.)

On May 19, 2009, plaintiff alleges that defendant Cheney brought plaintiff a used inhaler.  (<u>Id.</u>, at 6.)  Plaintiff alleges that defendant J. Turner-Gamberg, who was working the control tower, refused to call medical staff to replace plaintiff's inhaler.  Plaintiff contends that defendant Cheney refused to return to plaintiff's cell to get the used inhaler.  Plaintiff alleges defendant Cheney left plaintiff with no inhaler, and plaintiff had an asthma attack, which required a breathing treatment.  (<u>Id.</u> at 7.)  Plaintiff states that LVN Garcia ordered plaintiff a new inhaler and gave plaintiff a breathing treatment.  (<u>Id.</u> at 6.)  Plaintiff alleges that defendant Dr. Swingle, Chief Medical Officer, is supposed to make sure that medical staff does not pass out used medication by checking it out before delivery to the inmates' building.  (<u>Id.</u> at 7.)

Plaintiff alleges that defendant Turner-Gamberg also turned off the hot water to the day room in section A, allegedly stating that A section C-5 has nothing coming.  On May 19, 2009, plaintiff alleges that defendant Turner-Gamberg told plaintiff that if he didn't "kiss her ass" he "got nothing coming," which plaintiff states meant that plaintiff would not get medical attention because plaintiff was asking for a breathing treatment and had been given a used inhaler.  (<u>Id.</u>)  Plaintiff claims that defendant Turner-Gamberg searched his cell in retaliation for plaintiff filing grievances, that she refused to allow him to shower, and that she told plaintiff she would tell a correctional officer to spit in plaintiff's food if he did not stop kicking the door. (Dkt. No. 13 at 42.)  Finally, plaintiff contends that when he and other inmates are being strip-searched for yard, defendant Turner-Gamberg, a female correctional officer, is monitoring male inmates from the control tower while they are naked.  (<u>Id.</u> at 8.)

III.  Defendants' Motion for Summary Judgment

On March 23, 2012, defendants moved for summary judgment on the grounds that there is no evidence that they were deliberately indifferent to plaintiff's medical needs; there is no evidence that defendant Turner-Gamberg violated any of plaintiff's constitutional rights; and plaintiff failed to comply with the Government Claims Act.  In the alternative, defendants contend that they are entitled to qualified immunity.  (Dkt. No. 47.)  Plaintiff filed an opposition.  (Dkt. No. 54.)  Defendants filed a reply.  (Dkt. No. 57.)  On November 2, 2012, plaintiff was advised of the requirements for filing an opposition to a motion for summary judgment under Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998), and granted an additional thirty days in which to file an opposition.  (Dkt. No. 69.)  On November 29, 2012, plaintiff filed a statement that he relies on his prior opposition.  (Dkt. No. 72.)

A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

---

[2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

1    Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

2    387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

3    Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

4    burden of production may rely on a showing that a party who does have the trial burden cannot

5    produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

6    should be entered, after adequate time for discovery and upon motion, against a party who fails to

7    make a showing sufficient to establish the existence of an element essential to that party's case,

8    and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

9    "[A] complete failure of proof concerning an essential element of the nonmoving party's case

10   necessarily renders all other facts immaterial."  Id. at 323.

11              Consequently, if the moving party meets its initial responsibility, the burden then

12   shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

13   See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

14   to establish the existence of such a factual dispute, the opposing party may not rely upon the

15   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

16   form of affidavits, and/or admissible discovery material in support of its contention that such a

17   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

18   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

19   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

20   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

21   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

22   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

23   1436 (9th Cir. 1987).

24              In the endeavor to establish the existence of a factual dispute, the opposing party

25   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

26   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4

1   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

2   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

3   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

4   committee's note on 1963 amendments).

5           In resolving a summary judgment motion, the court examines the pleadings,

6   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

7   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

8   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

9   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

10  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

11  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

12  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

13  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

14  show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

15  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

16  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

17          B.  The Civil Rights Act

18          The Civil Rights Act under which this action was filed provides as follows:

19          Every person who, under color of [state law] . . . subjects, or causes
            to be subjected, any citizen of the United States . . . to the
20          deprivation of any rights, privileges, or immunities secured by the
            Constitution . . . shall be liable to the party injured in an action at
21          law, suit in equity, or other proper proceeding for redress.

22  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

23  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

24  Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978) ("Congress did not intend

25  § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976)

26  (no affirmative link between the incidents of police misconduct and the adoption of any plan or

policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects'

another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an

affirmative act, participates in another's affirmative acts or omits to perform an act which he is

legally required to do that causes the deprivation of which complaint is made."  Johnson v.

Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the

actions of their employees under a theory of respondeat superior and, therefore, when a named

defendant holds a supervisorial position, the causal link between him and the claimed

constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

(9th Cir. 1979) (no liability where there is no allegation of personal participation); Mosher v.

Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979) (no liability where

there is no evidence of personal participation).  Vague and conclusory allegations concerning the

involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board

of Regents, 673 F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual allegations of

personal participation is insufficient).

C.  Facts[3]

At all times relevant to this action, plaintiff was an inmate in the custody and

control of the California Department of Corrections and Rehabilitation ("CDCR") confined at

High Desert State Prison ("HDSP"); and defendant Mitchell was a licensed vocational nurse

("LVN"), defendant Cheney was an LVN, defendant Dr. Swingle was the Chief Medical Officer,

and defendant Turner-Gamberg was a correctional officer, all working at HDSP.

---

[3] Plaintiff did not address defendants' Statement of Undisputed Facts by admitting those facts that are undisputed and denying those that are disputed, as required by Local Rule 260(b). Rather, plaintiff filed a "Statement of Disputed Facts" (dkt. no. 54-1), which is permitted under Local Rule 260(b), but plaintiff failed to attribute the source of each of his undisputed facts as required.  Many of the facts he claims are disputed are not facts within his personal knowledge. The court has reviewed plaintiff's filing, as well as defendants' statement of undisputed facts, and, for purposes of the instant motion for summary judgment, finds the following relevant facts undisputed, unless otherwise noted.

It is undisputed that plaintiff suffers from asthma.[4]  Whether plaintiff's asthma constituted a serious medical need on the relevant dates appears to be at issue.

On December 23, 2008, plaintiff alleges that during dinner cell feeding on third watch, he informed the control booth officer and floor officer Ngard that he needed a breathing treatment because he was having an asthma attack.  Plaintiff alleges he was kicking his cell door and talking to the officers to request a breathing treatment, all while having an asthma attack.  In his deposition, plaintiff confirmed that he was wheezing, but he was able to talk, and it was painful.  (Pl.'s Depo at 35, 48-49.)

Plaintiff alleges that the control booth officer called defendant Mitchell, but that defendant Mitchell told the control booth officer that plaintiff would have to wait to receive a breathing treatment until pill call was over.  Plaintiff alleges that Officer Ngard made two phone calls to defendant Mitchell.  In all, plaintiff alleges three phone calls were made to defendant Mitchell, but plaintiff had to wait approximately two and one half hours to walk over to the C Facility Clinic and receive a breathing treatment.

On December 23, 2008, during third watch, Control Booth Officer Lysiak noted that cell feeding began at 1610 hours (4:10 p.m.), and Floor Officers Maroccia and Farias noted that cell feeding began at 1615 hours and cell feeding and clean up was complete at 1720 hours (5:20 p.m.).  Defendant Mitchell was working at the C Facility Clinic on third watch and among her duties was working at the C Facility clinic window passing out medications to inmates during pill call.

As an LVN, defendant Mitchell is familiar with the signs and symptoms of respiratory distress and asthma attacks.  Signs and symptoms may include:  shortness of breath; rapid breathing rate; color changes around the mouth, on inside of lips, or skin color; nose

---

[4]  Asthma is defined as "[a]n inflammatory disease of the lungs characterized by reversible (in most cases) airway obstruction."  STEDMAN'S MEDICAL DICTIONARY 35360 (27th ed. 2000).

flaring; chest retractions; sweating; grunting sounds; inability to speak; wheezing; and difficulty walking. A patient is not normally capable of yelling, screaming, kicking a cell door, or walking if he is under respiratory distress and having an asthma attack.

Defendant Mitchell does not recall having any telephone conversations with any correctional officers regarding plaintiff on December 23, 2008, nor does she recall any incident involving plaintiff or providing plaintiff with any treatment on December 23, 2008. Both the control booth officer's log book and the floor officer's log book show no documentation regarding plaintiff or any officer calling medical on December 23, 2008, regarding plaintiff.

If defendant Mitchell had been called by a correctional officer on December 23, 2008, her response to the officer would have been dependent on the information provided. If defendant Mitchell was informed that plaintiff was having an acute asthma attack and the correctional officer believed that plaintiff needed urgent/emergent medical attention, defendant Mitchell's standard practice and procedure would have been to immediately stop the pill line and respond to plaintiff's cell. Upon arrival to his cell, defendant Mitchell would physically assess plaintiff for symptoms of respiratory distress, and if plaintiff showed physical signs and symptoms of respiratory distress, defendant Mitchell would take diagnostic tests, including oxygen saturation and peak flow tests, to determine the severity of plaintiff's symptoms.

By contrast, if defendant Mitchell was informed by a correctional officer that plaintiff was kicking his cell door and able to converse normally to request a breathing treatment, it is likely that defendant Mitchell would have told the officer that plaintiff needed to wait until pill call was over to receive a breathing treatment, because the ability to kick a cell door and converse normally to ask for a breathing treatment are not signs of respiratory distress, an acute asthma attack, or any urgent, emergent, or emergency medical situation. Also, because defendant Mitchell knew plaintiff was an asthmatic, she also knew that plaintiff would have an inhaler in his cell that he could use which would achieve the same result as a breathing treatment. In fact, plaintiff had two inhalers in his cell on December 23, 2008, and used the Albuterol (Ventolin)

1  inhaler twice during the delay.

2  On December 23, 2008, had any correctional officer in plaintiff's building

3  considered plaintiff's medical condition to be an emergency, the correctional officers would have

4  immediately notified medical emergency responders by alarm, two-way radio, or telephone upon

5  discovery of plaintiff's condition.  Thus, if defendant Mitchell had been notified via alarm,

6  two-way radio, or telephone that it was an emergency situation, she would have immediately

7  responded to plaintiff's cell.  On December 28, 2008, plaintiff did not personally speak to

8  defendant Mitchell, and defendant Mitchell did not go to plaintiff's cell.

9  Plaintiff received a breathing treatment on December 23, 2008, around 7:00

10  p.m., in the C Facility Clinic after walking from his cell in C Facility, Building 5.  If plaintiff was

11  able to walk from his cell across the yard to receive a breathing treatment, he was not in

12  respiratory distress or in any urgent/emergent/emergency need of a breathing treatment.  After

13  receiving the breathing treatment, plaintiff was fine.

14  Defendant Swingle played no role in plaintiff's medical care, treatment, or

15  medication issues on December 23, 2008.  (Dkt. No. 47-7 at 3.)  The only involvement defendant

16  Swingle had with respect to the December 23, 2008 incident was providing the Second Level

17  Appeal Response to plaintiff's inmate grievance, Log No. HDSP-31-08-17348 on March 11,

18  2009.  (Dkt. No. 47-7 at 2.)  Defendant Swingle noted that at the first level interview with Family

19  Nurse Practitioner ("FNP") Wrigley, plaintiff had asthma medications in his possession, and had

20  a standing order for breathing treatments as needed.  (Id.)  Defendant Swingle further noted that

21  records showed that plaintiff was given a breathing treatment on December 23, 2008.  (Id.)

22  Defendant Swingle partially granted plaintiff's appeal at the second level because plaintiff had

23  been seen for his chronic care issues including asthma and hypertension, but his appeal had not

24  been accepted as a staff complaint, and plaintiff had not shown proof of misconduct or adverse

25  action for somebody to be fired for medical neglect.  (Id. at 2-3.)

26  ////

1    Plaintiff alleges that on May 19, 2009, defendant Cheney gave plaintiff a used

2    inhaler at 1:00 p.m. while she was passing out medications to inmates in his housing unit.  (Dkt.

3    No. 13 at 6.)  One duty of an LVN in Facility C is passing out medications to inmates in the eight

4    buildings in Facility C.  (Dkt. No. 47-5 at 4-5.)

5    Prior to passing out the medications to inmates in the housing units, the pharmacy

6    delivers a large plastic bag of medications to the C Facility Clinic generally between 1200 and

7    1330 hours (12:00 p.m. and 1:30 p.m.).  (Id. at 5.)  Contained within the large plastic bag are

8    individual medications for different inmates.  For example, if an inmate is prescribed an inhaler,

9    the inhaler will have a label on it identifying the inmate, the inmate's building and cell number,

10   and the type of inhaler.  (Id.)  The duty of the LVN is taking the medications out of the large

11   plastic bag delivered by pharmacy, and sorting the medications by building number.  (Id.)

12   Another duty is comparing the medication label to each inmate's Medication Administration

13   Record ("MAR") to ensure that the five R's are followed:  the right patient is given the right

14   medication, the right dose, the right route, at the right time.  (Id.)  While an LVN's duties include

15   sorting the medications and ensuring that the five R's are followed, the Pharmacist in Charge

16   ("PIC") is responsible for all medication procurement, dispensing, and labeling.  (Id.; Dkt. No.

17   47-7 at 2.)  An LVN cannot place medication labels on medications or remove medication labels

18   from medications.  (Dkt. No. 47-5 at 5.)  Thus, if there was an error in labeling a medication, the

19   error would be the responsibility of the pharmacy, not the LVN.  (Id.; Dkt. No. 47-7 at 2.)

20   Plaintiff is suing defendant Cheney because he alleges that she was negligent for

21   passing out an allegedly used inhaler to him.  (Pl.'s Depo at 64, 72 & 74.)  Plaintiff was not

22   having any breathing problems prior to defendant Cheney passing out the inhaler to him, but he

23   alleges that he had an asthma attack trying to get her attention after she passed out the inhaler to

24   him.  (Id. at 68.)  Plaintiff has admitted, however, that he has no evidence that defendant Cheney

25   was aware of his alleged need for a breathing treatment, or any alleged breathing problems on

26   May 19, 2009.  (Id. at 74.)  Moreover, defendant Cheney ordered a new Albuterol (Ventolin)

10

1  inhaler for plaintiff on May 19, 2009.  (Dkt. No. 47-6 at 7.)

2          Plaintiff filed an inmate grievance, Log No. HDSP-31-09-12053, on May 19,

3  2009, regarding defendant Cheney giving plaintiff a used inhaler.  (Dkt. No. 13 at 30.)  In his

4  grievance, plaintiff wanted to know whether defendant Cheney or pharmacy was responsible for

5  giving him a used inhaler.  (Id.)  At the informal level, plaintiff's appeal was granted and the

6  response stated:  "Per pharmacy, an error was made in labeling your medication.  This is a

7  training issue and has been addressed with the appropriate staff."  (Id.)  Even though his appeal

8  was granted, plaintiff completed Section D of his appeal by stating:  "All right then I understand.

9  Just make sure it doesn't happen again alright."  (Id.)

10          With respect to defendant Dr. Swingle and May 19, 2009, plaintiff is suing her

11 because defendant Dr. Swingle, as the Chief Medical Officer (CMO), is supposed to make sure

12 that her medical staff does not pass out used medication by checking it out before bringing the

13 medication to the buildings to pass out.  (Dkt. No. 13 at 7.)  Plaintiff is also suing defendant Dr.

14 Swingle because she was the supervisor.  (Pl.'s Depo at 67, 72.)  During all relevant times, as the

15 CMO at HDSP, defendant Dr. Swingle's duties included supervision and management of the

16 overall clinical medical program in the institution.  (Dkt. No. 47-7 at 2.)  Defendant Dr. Swingle

17 did not have any authority over nursing, mental health, or dental services.  (Id.)

18          As the CMO at HDSP, defendant Dr. Swingle did not supervise the pharmacist or

19 the pharmacy staff.  (Id.)  The Pharmacist in Charge (PIC) was responsible for all medication

20 procurement and dispensing.  The Supervising Registered Nurse III (SRNIII) and other nursing

21 supervisory staff were responsible to oversee all medication distribution.  The Registered Nurse

22 (RN) staff in each clinic was responsible to oversee distribution of medications.  (Id.)

23          While plaintiff alleges that defendant Dr. Swingle was supposed to make sure that

24 the nursing staff did not pass out used medications, as the CMO, defendant Dr. Swingle did not

25 have authority or supervision over nursing staff, and did not have authority over the pharmacist

26 or the pharmacy staff.  (Id.)  Defendant Dr. Swingle played no role in plaintiff receiving a used

1   inhaler on May 19, 2009.  (Id. at 3.)  Defendant Dr. Swingle had no knowledge that plaintiff

2   received a used inhaler, and she did not have any reason to suspect that an alleged used inhaler

3   would be passed out to plaintiff.

4          Defendant Dr. Swingle played no role in plaintiff's medical care, treatment, or

5   medication issues on May 19, 2009.  (Id.)  While plaintiff was at HDSP, defendant Dr. Swingle

6   never met plaintiff, examined plaintiff, treated plaintiff, or prescribed medication for plaintiff.

7   (Id.)

8          With respect to defendant Turner-Gamberg on May 19, 2009, plaintiff is suing her

9   because she allegedly refused to call medical to inform them that plaintiff had received a used

10  inhaler, and needed medical attention even though plaintiff was yelling for over an hour and

11  kicking his cell door.  (Pl.'s Depo at 69-70.)  Defendant Turner-Gamberg was on duty as the C5

12  control booth officer on May 19, 2009.  (Dkt. No. 47-9 at 2.)  On each watch as a control booth

13  officer, it was defendant Turner-Gamberg's duty to document in a log book the activities and

14  occurrences which took place throughout her watch.  (Id.)  It was also defendant Turner-

15  Gamberg's responsibility to document odd or unusual occurrences, such as emergencies, assaults,

16  or inmate medical emergencies.  (Id.)

17         Despite plaintiff's claim that defendant Turner-Gamberg did not call medical

18  staff, the control booth log book reflects that on May 19, 2009, at 1:10 p.m. (1310), defendant

19  Turner-Gamberg contacted the medical staff because plaintiff claimed that he had received a

20  used asthma pump, or something to that effect.  She documented the log as follows:

21         Contacted medical – [plaintiff] claiming they gave him a used
            asthma "pump' or something – They said gave him a brand
22          new one.  [Plaintiff] screaming about something [Turner-Gamberg]
            didn't understand – [Turner-Gamberg] told [plaintiff] [she] spoke
23          to the nurse and that [she is] not a "medical" employee.  [Plaintiff]
            kicking the door and throwing a fit.
24

25  (Dkt. No. 47-10 at 5.)  Medical informed defendant Turner-Gamberg that they had given plaintiff

26  a brand new asthma pump or inhaler.  Defendant Turner-Gamberg informed plaintiff that she had

spoken with the nurse and that she was not a medical employee.  Neither medical nor defendant Turner-Gamberg considered plaintiff to be in any sort of emergency situation.  (Dkt. No. 47-9 at 3.)  Defendant Turner-Gamberg denies telling plaintiff that he had to "kiss her ass" in order to get medical attention.

Based on defendant Turner-Gamberg's experience, training, and observations, because plaintiff was able to scream, kick his door and throw a fit, she did not consider plaintiff to be having an asthma attack, or to be in any sort of emergency.  Had plaintiff been in any sort of emergency, defendant Turner-Gamberg would have immediately notified the floor officers from her location in the control booth to check on plaintiff and evaluate his condition.  (Id.)

Shortly after 2:00 p.m., plaintiff walked over to medical and received a breathing treatment and also received a new inhaler that day which defendant Cheney had ordered for him.  (Dkt. Nos. 47-6 at 7; 48-1 at 19.)  Since this May 19, 2009 incident, plaintiff did not receive another used inhaler while he was incarcerated at HDSP.  (Pl.'s Depo at 74.)

Once in June of 2009, and on another unspecified date, plaintiff alleges that defendant Turner-Gamberg would turn off the hot water in the day room in the mornings.  Plaintiff alleges this is a violation of Title 15 and that defendant Turner-Gamberg was abusing her power.  (Pl.'s Depo at 92.)  As a control booth officer, defendant Turner-Gamberg's primary job duties and objectives were to ensure the safety and security of the two floor officers as well as the safety and security of the inmates.  (Dkt. No. 47-9 at 2.)  Other job duties included, but were not limited to, maintaining the orderly administration and functioning of inmate movement and programming, opening cell doors electronically, and informing inmates of appointments via the public address system (PA system) or through verbal communication without the PA system.  It was defendant Turner-Gamberg's responsibility to ensure that the daily activities, movement and programming of inmates went smoothly.  (Id.)

While plaintiff alleges no specific dates that defendant Turner-Gamberg turned off the hot water in the day room, defendant Turner-Gamberg admits that she would occasionally

turn off the hot water in the dayroom.  (Dkt. No. 47-9 at 3.)  Defendant Turner-Gamberg turned off the hot water in the dayroom because inmates would congregate around the hot water sink in the dayroom on their way back from chow to their cells, and the congregation of inmates not only presents a safety and security threat for the inmates and floor staff, but it also interferes with the orderly administration and movement of the inmates.  (Id. at 3-4.)  Until all the inmates in A, B and C Sections were safely secured back in their cells, no sections would be released for yard or to program.  (Id. at 4.)  By turning off the hot water in the dayroom, which she claims is a common practice among control booth officers, defendant Turner-Gamberg was able to ensure that all the inmates in A Section would not delay the administration, movement and programming of all other inmates in C5.  (Id.)  Turning off the hot water in the day room affected all inmates, not just plaintiff.  (Id.)  Moreover, once the inmates in A Section were back in their cells, porters were allowed to get hot water for any inmate, and most inmates had hot water or hot pots in their cells.  Also, the hot water was turned back on in the day room after all inmates were secured in their cells.  (Id.)

Plaintiff contends defendant Turner-Gamberg would turn off the hot water to intimidate the inmates to do what they were supposed to do, or to control what section got released to the yard first.  Defendant Turner-Gamberg states she would turn off the hot water in the dayroom not as an intimidation tactic, or to punish inmates, but to ensure the safety and security of the inmates and floor officers, and to ensure the orderly administration, movement and programming of the inmates.  (Dkt. No. 47-9 at 4.)

As a control booth officer, defendant Turner-Gamberg had no control over what section in C5 got released to yard first, second, or last, other than to open the cell doors and the door to the yard.  (Id.)  The floor officers had the control, and dictated whether A Section, B Section, or C Section went to yard first, second, or last.  The floor officers made the decision of the order of which section was released to yard, and defendant Turner-Gamberg's only responsibility or involvement was opening the cell doors and the door to the yard as directed by

the floor officers.  (Id.)

Plaintiff also alleges that defendant Turner-Gamberg violated his Fourth Amendment rights because she would monitor the inmates being strip searched.  (Pl.'s Depo at 79.)  Plaintiff admits that defendant Turner-Gamberg did not (a) physically conduct strip searches, (b) say anything to plaintiff, or (c) make any hand gestures towards plaintiff.  (Id. at 85.)  When it was necessary, inmates in C5, including A Section, would be strip searched on the dayroom floor at the tables.  (Dkt. No. 47-9 at 5.)  The time an inmate is unclothed is approximately 30 to 45 seconds.  (Id.)

Defendant Turner-Gamberg explained that C5 at HDSP is a 180° design facility, and the control booth is elevated off the ground floor, on the second tier.  (Dkt. No. 47-9 at 2.) This layout appears to allow the control booth unrestricted viewing of the dayrooms.  (Dkt. No. 47-10 at 2.)

While plaintiff alleges that defendant Turner-Gamberg would "monitor" or "stalk"[5] plaintiff while he was naked during the strip search, defendant Turner-Gamberg's duty as the control booth officer was to provide coverage for the floor officers and ensure the safety and security of the floor staff.  (Id.)  To provide the floor officers safety, security and coverage, defendant Turner-Gamberg would observe, from the control booth, all inmates -- not just the one being strip searched, or just plaintiff being strip searched.  (Id.)  Defendant Turner-Gamberg did not (a) make any comments to plaintiff, (b) gawk at him, (c) point at him, or (d) joke about him, during these strip searches.  Defendant Turner-Gamberg did not physically conduct a strip search

_____

[5]  In his deposition, when asked what he meant by "monitoring," plaintiff responded: She's sitting right there watching. . . .  She's staring at us while we get naked.  She's watching. (Pl.'s Depo at 81.)  Later, plaintiff claimed defendant Turner-Gamberg was "stalking [him] while [he] was naked.  I seen [sic] her look at me."  (Id. at 84.)  When asked whether defendant Turner-Gamberg also looked at other inmates, or just plaintiff, plaintiff stated he "wasn't paying attention to what she was doing with the other inmates. . . .  You would have to ask them."  (Id. at 85.)  In his opposition and supporting declaration, plaintiff also claims defendant Turner-Gamberg was "stalking" him from her position in the control booth.  (Dkt. Nos. 54 at 7; 54-2 at 4.)

1   or inspection of plaintiff, or physically search his clothing, or conduct a clothed pat-down search

2   of plaintiff.  (Id.)  When the strip searches occurred, defendant Turner-Gamberg was in the

3   control booth, and did not leave the control booth.  (Id.)

4          Plaintiff also alleges that defendant Turner-Gamberg would tell floor officers to

5   conduct cell searches of plaintiff's cell in retaliation for his filing a 602 appeal against her.  (Pl.'s

6   Depo at 100.)  Defendant Turner-Gamberg states she never retaliated against plaintiff in any way,

7   and every inmate has a right to file a 602 appeal.  (Dkt. No. 47-9 at 5.)  In terms of cell searches,

8   as a control officer, unless defendant Turner-Gamberg saw something specific such as

9   unauthorized items being passed under a cell door, she did not order any cell searches or get

10  involved in cell searches.  (Id.)  Defendant Turner-Gamberg did not order a floor officer to

11  conduct a retaliatory cell search of plaintiff's cell or any other inmate's cell.  (Id.)  Defendant

12  Turner-Gamberg does not recall if she ever ordered a search of plaintiff's cell.  (Id.)  Each floor

13  officer was to conduct three random cell searches per day, per watch.  (Id.)  The only

14  involvement defendant Turner-Gamberg had with cell searches was when a floor officer would

15  inform her that a cell search was to be conducted, defendant Turner-Gamberg would open the

16  cell door from the control booth.  (Id.)

17         Finally, plaintiff alleges that defendant Turner-Gamberg refused to allow him and

18  his cellmate to shower on August 23, 2009, when plaintiff was kicking his cell door, and that

19  defendant Turner-Gamberg stated that she would have an officer spit in plaintiff's food if he did

20  not stop kicking the door.  (Dkt. No. 13 at 67.)  Defendant Turner-Gamberg does not recall the

21  events of this particular day, but declares she never refused to allow plaintiff to shower, nor did

22  she ever tell plaintiff that she would have an officer spit in plaintiff's food.  (Dkt. No. 47-9 at 6.)

23         As the control booth officer, on the days inmates were allowed to shower,

24  defendant Turner-Gamberg would start releasing inmates to shower either from the left side of

25  the tier in a section, or from the right side of the tier in a section.  (Dkt. No. 47-9 at 6.)

26  Defendant Turner-Gamberg also alternated between starting with the lower tier or the upper tier.

1  (Id.)  There is one shower in the middle of the cells on the upper tier, and one shower in the

2  middle of the cells on the lower tier.  (Id.)  No matter where defendant Turner-Gamberg started,

3  she would ask each inmate in a cell whether or not he wanted a shower.  (Id.)  If the inmate

4  wanted to shower, defendant Turner-Gamberg would open the inmate's cell door to release him

5  to shower.  (Id.)  Generally, an inmate would shower for 10-15 minutes.  (Id.)  However,

6  depending on how long an inmate took to shower, or how many inmates wanted to shower on a

7  particular day, not every inmate in every cell would have the opportunity to shower during

8  defendant Turner-Gamberg's watch.  (Id.)  If defendant Turner-Gamberg was not able to get to

9  every inmate on her watch, she would inform the third watch officers, and they would finish

10  allowing each inmate to shower.  (Id.)

11         Neither on August 23, 2009, nor on any other day, did defendant Turner-Gamberg

12  tell plaintiff that she was going to have an officer spit in his food.  (Id.)  Defendant Turner-

13  Gamberg denies telling plaintiff that she would tell an officer to spit in plaintiff's food, and she

14  did not witness any officer spit in plaintiff's food.  (Id.)  When a particular housing section is on

15  cell feeding, unlabeled trays of food are randomly placed on food carts in the kitchen.  (Id.)

16  Once the cart arrives at a housing unit, floor officers randomly grab trays from the food cart and

17  pass out the food trays to inmates.  (Id.)  Plaintiff alleges that he had a cellmate on August 23,

18  2009. (Dkt. No. 13 at 67.)  When there are two inmates in a cell, the floor officer passes two

19  trays of food to the inmates. (Dkt. No. 47-9 at 6-7.)  It is the inmates' choice which tray of food

20  each will eat.  (Id. at 7.)

21  IV.  Eighth Amendment Claims

22         A.  Legal Standards

23         Inadequate medical care does not constitute cruel and unusual punishment

24  cognizable under § 1983 unless the mistreatment rose to the level of "deliberate indifference to

25  serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

26  ////

> In the Ninth Circuit, the test for deliberate indifference consists of two parts.  First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'  Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.  This second prong -- defendant's response to the need was deliberately indifferent -- is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference.  Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.

Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations and quotations omitted).

To establish deliberate indifference, a plaintiff must show that defendants knew of and disregarded an excessive risk to his health or safety.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  A prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inferences."  Id.  The nature of a defendant's responses must be such that the defendant purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.  McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).  Deliberate indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment, or may be demonstrated by the way in which prison officials provide medical care.  Id. at 1059-60.

However, a showing of merely inadvertent or even negligent medical care is not enough to establish a constitutional violation.  Estelle, 429 U.S. at 105-06; Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998).  A mere difference of opinion concerning the appropriate treatment cannot be the basis for an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  Instead, an inmate must allege facts sufficient to indicate a culpable state of mind on the part of prison officials.  Wilson v. Seiter, 501 U.S. 294, 297-99 (1991).  Accordingly, a difference of opinion

18

1   about the proper course of treatment is not deliberate indifference, nor does a dispute between a

2   prisoner and prison officials over the necessity for or extent of medical treatment amount to a

3   constitutional violation.  See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004)

4   (difference between medical opinion of physician for prisoner's estate and treating physician did

5   not demonstrate deliberate indifference); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

6           In order to defeat the motion for summary judgment, plaintiff must "produce at

7   least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630,

8   that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to

9   plaintiff's health," Jackson, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

10          B.  Analysis

11               i.  Defendant Mitchell

12          First, defendants adduced evidence that Officer Ngard was not on duty during

13   third watch on December 23, 2008.  (Dkt. No. 48-1 at 3, 6.)  The control booth and floor officers'

14   log books reflect Correctional Officers Barker, Lysiak, T. Barron, Wedemeyer, Maroccia, and

15   Farias were on duty.  (Id.)  Plaintiff failed to rebut this evidence.[6]

16          Second, the control booth's and floor officer's log books do not reflect that

17   correctional officers placed a call to medical on plaintiff's behalf on December 23, 2008.  (Id.)

18   Defendant Mitchell does not recall receiving any phone calls regarding plaintiff on December 23,

19   2008.  (Dkt. No. 47-5 at 3.)

20          Plaintiff claims that he asked Correctional Officer Lysiak to call medical, and that

21   Lysiak allegedly told plaintiff that "LVN Mitchell said to wait until after pill call."  (Dkt. No. 54-

22   2 at 2.)  Plaintiff then asked Officer Ngard to call medical twice, which he claims Officer Ngard

23

24          [6]  As noted above, plaintiff alleges that he informed Correctional Officer Ngard, while
     Ngard was picking up dinner trays, that plaintiff needed a breathing treatment. Plaintiff insists he
25   spoke with Officer Ngard, and declares that he did not once see Officers Maroccia and Farias on
     third watch, and suggests "someone clocked in for them both." (Dkt. No. 54-2 at 2.)  But
26   plaintiff did not provide a declaration from Officer Ngard confirming plaintiff's allegations.

1   did, and alleges Officer Ngard told plaintiff that he must wait until pill call was over.  (Id.)  In his

2   deposition, plaintiff claimed that the evidence of communication between the officers and

3   defendant Mitchell would be in the logbooks.  (Pl.'s Depo. at 41.)  Plaintiff confirmed that he

4   only sued defendant Mitchell because the officers told plaintiff that Mitchell was the person they

5   contacted.  (Id. at 55.)

6          However, it is undisputed that on December 23, 2008, plaintiff did not speak with

7   defendant Mitchell, and defendant Mitchell did not come to plaintiff's cell.  Defendant Mitchell

8   does not recall speaking with officers concerning plaintiff on December 23, 2008.  Plaintiff did

9   not present declarations from Officers Ngard or Lysiak confirming that they spoke with

10  defendant Mitchell on December 23, 2008.  Thus, plaintiff failed to rebut defendants' evidence.

11         Third, assuming, *arguendo*, that an officer did place a call to medical on

12  December 23, 2008, plaintiff failed to demonstrate the call was received by defendant Mitchell.

13  Again, plaintiff failed to submit declarations from any of the officers confirming they spoke with

14  defendant Mitchell.  In his deposition, plaintiff confirmed that he was in his cell, out of the

15  presence of the officers when they called medical, and was aware of the phone calls only because

16  the officers told him.  (Pl.'s Depo at 37.)  In his verified amended complaint, plaintiff avers that

17  there were two LVN's working that night.  (Dkt. No. 13 at 6.)  Thus, if a correctional officer had

18  called medical, he might have spoken with an LVN who was not defendant Mitchell.  In any

19  event, plaintiff provided no documentary evidence from medical demonstrating that defendant

20  Mitchell received a call concerning plaintiff on December 23, 2008.  Plaintiff was ultimately

21  released to medical, which suggests someone at medical was informed that plaintiff required a

22  breathing treatment because someone authorized his release, but plaintiff failed to demonstrate it

23  was defendant Mitchell who did so.

24         For all of the above reasons, the court finds that plaintiff failed to link or connect

25  defendant Mitchell with the alleged failure to provide plaintiff with medical treatment, and

26  defendant Mitchell is entitled to summary judgment.

1     But even assuming, *arguendo*, that defendant Mitchell had instructed the

2     correctional officer to inform plaintiff that he must wait until after pill call, plaintiff failed to

3     demonstrate that defendant Mitchell acted in deliberate indifference to plaintiff's serious medical

4     needs.

5     Defendant Mitchell declares that had she been informed by a correctional officer

6     that plaintiff was kicking his cell door, and able to converse normally to request a breathing

7     treatment, it is likely that she would have told the officer that plaintiff needed to wait until after

8     pill call, because there were no signs of respiratory distress, an acute asthma attack, or any

9     urgent, emergent, or emergency medical situation.  (Dkt. No. 47-5 at 3.)  Conversely, had the

10    correctional officer relayed that plaintiff was having an acute asthma attack and the officer

11    believed that plaintiff needed urgent/emergent medical attention, defendant Mitchell would have

12    stopped the pill line, and responded to plaintiff's cell.  (Dkt. No. 47-5 at 3.)  Moreover, defendant

13    Mitchell stated that because she knew that plaintiff is an asthmatic, he would have had an inhaler

14    in his cell that he could use that would achieve the same result as a breathing treatment.  (Id.)

15    During his deposition, plaintiff admitted having both of his inhalers in his cell, but

16    stated that the Floravent is used to prevent an asthma attack, and the Ventinol inhaler wasn't

17    working; that is, medication was coming out, but it wasn't stopping his wheezing.  (Pl.'s Depo at

18    44.)  Plaintiff said he used the Ventinol inhaler two times during the two and a half hour delay.

19    (Id. at 45.)  Again, however, plaintiff cited to no evidence demonstrating that defendant Mitchell

20    was aware that plaintiff's Ventinol inhaler was not working,[7] or that defendant Mitchell was

21    aware that plaintiff was in urgent need of medical care.

22    Here, there is no evidence confirming what information an officer relayed to

23    defendant Mitchell.  But even assuming, *arguendo*, that an officer informed defendant Mitchell

24

25    [7]  In his deposition, plaintiff vaguely claimed that "they" knew the Ventinol wasn't
working because "it was already documented to them before."  (Pl.'s Depo at 50.)  Plaintiff did
26    not address this argument in his opposition.

that plaintiff claimed he was having an asthma attack and needed a breathing treatment, the

evidence demonstrates that any decision to delay plaintiff's receipt of the treatment would have

been based on defendant Mitchell's medical experience as an LVN, and her knowledge that

plaintiff had inhalers in his cell.  Plaintiff failed to adduce any evidence demonstrating that on

December 23, 2008, defendant Mitchell acted with a culpable state of mind, or with reckless

disregard to a substantial risk of harm to plaintiff, rather than based on her medical experience

and training.  Plaintiff's belief that he should have received a breathing treatment sooner, without

more, is a difference of opinion regarding the appropriate medical treatment, and cannot be the

basis for an Eighth Amendment violation.  Jackson, 90 F.3d at 332.

Plaintiff cites various cases, but primarily relies on Adams v. Poag, 61 F.3d 1537

(11th Cir. 1995).  Plaintiff contends that Adams shows that a prisoner can have problems

breathing, and the LVN can say that there was no problem with breathing, but the prisoner can

end up dead, and that Adams demonstrates that defendant Mitchell was wrong to make plaintiff

wait until after pill call.  (Dkt. No. 54 at 4.)

However, the instant case is quite different from Adams.  In Adams, the prisoner

died after receiving three weeks of medical treatment.  Id.  The prisoner's parents claimed, *inter*

*alia*, that the part-time jail physician did not diligently pursue alternative means of treating their

son's condition.  Id. at 1539-41.  The court found that the parents' claim did not rise to the level

of deliberate indifference.  Id. at 1546.  The court reiterated that "Estelle[, 429 U.S. at 106]

requires . . . not merely the knowledge of a condition, but the knowledge of necessary treatment

coupled with a refusal to treat properly or a delay in such treatment."  Id. (internal citation

omitted).  Thus, Adams is inapposite.[8]

---

[8] As one district court in Georgia stated:

In Adams, a prisoner who suffered from chronic asthma exhibited wheezing,
coughing, shortness of breath, and labored breathing just prior to his death from
acute respiratory failure.  61 F.3d at 1539-41.  Although the severity of the
prisoner's medical needs was undisputed based on those facts, nothing in Adams

Finally, the court turns to the alleged delay.  Even assuming, *arguendo*, that defendant Mitchell advised the officers that plaintiff must wait until after pill call to receive his breathing treatment, plaintiff failed to demonstrate he was harmed by the delay.

Plaintiff declares that defendant Mitchell was deliberately indifferent based on the delay in providing plaintiff a breathing treatment.  Plaintiff claims he had to wait over two and a half hours before receiving the breathing treatment.  Defendants contend that plaintiff was not harmed by the delay.

As noted above "[i]ndifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison

suggests that every episode of asthma symptoms constitutes a serious medical need.  It is common knowledge that some asthma "attacks" are mild and brief in duration, while others are severe, prolonged, and even life threatening.  Courts recognize this distinction and refuse to fashion a rule that every instance of failure to treat a prisoner or detainee's asthma rises to the level of a constitutional claim. Williams v. Rodriguez, 509 F.3d 392, 401-02 (7th Cir. 2007) (arrestee's asthma was not objectively severe enough to constitute a serious medical need).  Most courts that have addressed the issue have required a showing that the asthma attack was severe or that it led to physical harm.  Compare Williams, 509 F.3d at 402 (no evidence arrestee was suffering from a severe asthma attack sufficient to state a constitutional claim), King v. Kilgore, 98 F.3d 1338 (5th Cir. 1996) (per curiam) (unpublished table decision) (prisoner failed to allege facts showing that he experienced substantial harm resulting from delay in treating his asthma), Thomas v. Mikell, 2008 WL 2156362, at *2 (S.D. Ga. May 22, 2008) (prisoner who alleges that he was suffering "chest pains" of unspecified severity, and that he "went to bed sick" does not allege type of severe asthma attack that courts have recognized as requiring immediate medical attention), and Reeves v. Wallington, 2007 WL 3037705, at *4 (E.D. Mich. Oct.17, 2007) (prisoner's claim of breathing difficulties due to asthma did not meet the objective component of the deliberate indifference test, as he had not shown his asthma constituted a serious medical condition), with Johnson v. Farrey, 2003 WL 23111966, at *3 (W.D. Wis. Nov.14, 2003) (prisoner's allegation that guards observed him having severe asthma attack and refused to furnish his asthma inhaler, thus requiring his hospitalization, satisfied the objective component of an Eighth Amendment claim), and Harrison v. Sample, 2007 WL 1319525, at *1 (N.D. Cal. May 4, 2007) (allegation that prisoner "blacked out and lost consciousness" as a result of guard's refusal to provide asthma inhaler stated an Eighth Amendment claim), overruled on other grounds by Harrison v. Sample, 359 Fed. Appx. 893 (9th Cir. 2009) (fact issue existed as to whether prison officer was aware that state prisoner was experiencing a medical emergency).

Crosby v. Perry, 2010 WL 2464887, *6 n.9 (M.D. Ga. 2010)

23

1   physicians provide medical care." <u>Jett</u>, 439 F.3d at 1096; <u>McGuckin</u>, 974 F.2d at 1060.  There is

2   no Eighth Amendment violation if any delay in treatment is not harmful.  <u>Shapley v. Nevada Bd.</u>

3   <u>of State Prison Com'rs.</u>, 766 F.2d 404, 407 (9th Cir. 1985).

4        Unlike the prisoner in <u>Adams</u>, plaintiff alleged no facts demonstrating that he was

5   experiencing an acute asthma attack on December 23, 2008.  In his deposition, plaintiff claimed

6   that on December 23, 2008, he was having an asthma attack, or that he was "wheezing." (Pl.'s

7   Depo, *passim*.)  When asked what his damages were for the delay, plaintiff stated he was "sitting

8   there in pain and feeling humiliated" -- because he was left in his cell "with pain and suffering

9   sitting there with his lungs closing up on him."  (<u>Id.</u> at 49.)

10       However, plaintiff does not describe the nature or severity of the wheezing, or any

11  other symptoms he was feeling.  Plaintiff adduced no medical evidence demonstrating that on

12  December 23, 2008, he was having an acute asthma attack, or was in respiratory distress.  It is

13  undisputed that plaintiff could talk, was kicking the cell door, and yelling for over an hour.  (Pl.'s

14  Depo at 69-70.)  Defendant Mitchell declares, as an LVN, that a patient experiencing an asthma

15  attack "is not normally capable of yelling, screaming, kicking a cell door, or walking if he is

16  under respiratory distress." (Dkt. No. 47-5 at 2.)  Plaintiff did not rebut this evidence.  Moreover,

17  it is also undisputed that despite the two and a half hour delay, plaintiff was able to walk from his

18  upper tier cell, down the stairs, out the door, and across the yard to the clinic.  (Pl.'s Depo at 53.)

19  Plaintiff provided no medical evidence that he sustained harm from the delay on December 23,

20  2008.  Rather, plaintiff provided evidence that he received a breathing treatment on December

21  23, 2008, and no additional medical treatment was required.  Moreover, following the breathing

22  treatment, plaintiff concedes that he was fine.  (<u>Id.</u> at 27.)

23        Thus, there is no evidence that the two and a half hour delay in the medical

24  treatment caused the unnecessary and wanton infliction of pain, significant harm, or permanent

25  injury.  <u>Adams</u>, 61 F.3d at 1544 ("Some delay in rendering medical treatment may be tolerable

26  depending on the nature of the medical need and the reason for the delay."); <u>Blackfoot v. Mijares</u>,

2011 WL 3477024, *4 (C.D. Cal. 2011) (prisoner failed to demonstrate harm from the delay where his asthma symptoms were relieved when he received his inhaler ten hours after the pepper spray incident); see Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994) (per curiam) (affirming directed verdict where the plaintiff did not offer any evidence that the delay in treatment resulted in any harm); Shapley, 766 F.2d at 407 ("[M]ere delay of [medical treatment], without more, is insufficient to state a claim of deliberate medical indifference."). Cf. Brown v. Hand, 79 Fed. Appx. 995 (9th Cir. 2003) (summary judgment precluded where disputed issues of fact existed as to whether defendant placed prisoner at substantial risk of serious harm due to an over one-month delay in receiving his Ventolin inhaler.)

For all of the above reasons, no reasonable fact-finder could conclude that defendant Mitchell was deliberately indifferent to plaintiff's serious medical needs in violation of his Eighth Amendment rights.  Therefore, the undersigned recommends that defendant Mitchell be granted summary judgment on plaintiff's Eighth Amendment claim.

ii.  Defendant Cheney

Plaintiff contends that defendant Cheney was deliberately indifferent to plaintiff's serious medical needs when she delivered a used inhaler to plaintiff's cell on May 19, 2009, around 1:00 p.m.  However, the undisputed evidence demonstrates that the PIC is responsible for all medication procurement, dispensing, and labeling.  Thus, defendant Cheney was not responsible for the mislabeling of the inhaler.

Plaintiff also claims that defendant Cheney was deliberately indifferent because if she had been following the five R's as required in handling medication, she would have noticed the mislabeling or that the inhaler was used, and would not have delivered it to plaintiff's cell.

"The indifference to medical needs must be substantial; a constitutional violation is not established by negligence or 'an inadvertent failure to provide adequate medical care.'" Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (quoting Estelle, 429 U.S. at 105-06).

1    Here, plaintiff alleges he was delivered a used inhaler on one isolated occasion,

2  and in his deposition confirmed this did not happen again at HDSP.  (Pl's Depo at 74.)  Plaintiff

3  cites to no evidence demonstrating that defendant Cheney acted with a culpable state of mind

4  when she delivered the inhaler.  There is no evidence in the record showing that defendant

5  Cheney knew the prescription was mislabeled, or that she knew the inhaler was used.  In his

6  deposition, plaintiff conceded that defendant Cheney's actions were, at most, negligent.  (Pl.'s

7  Depo at 64, 72, & 74.)  Thus, defendant Cheney's delivery of the mislabeled prescription,

8  without more, amounts to mere negligence, and she is entitled to summary judgment on

9  plaintiff's claim that she delivered a mislabeled or used inhaler on May 19, 2009.

10    Finally, in his opposition, plaintiff claims that defendant Cheney "refused to come

11  back to [plaintiff's] cell and get the used inhaler," which left plaintiff with no inhaler for his

12  subsequent asthma attack, so plaintiff had to get a breathing treatment.  (Dkt. No. 13 at 7.)

13  However, in his deposition, plaintiff admitted that he was not having breathing problems when

14  defendant Cheney delivered the inhaler around 1:00 p.m., and that plaintiff only started suffering

15  an asthma attack when he tried to get her attention.  (Pl.'s Depo at 68.)  In his deposition,

16  plaintiff conceded that defendant Cheney was not aware of plaintiff's subsequent breathing

17  problem, allegedly because she would not come back to plaintiff's cell.  (Id. at 74.)  Thus, it is

18  undisputed that defendant Cheney did not return to plaintiff's cell, and did not know that plaintiff

19  was suffering a breathing problem.  Therefore, plaintiff failed to demonstrate a triable issue of

20  material fact exists as to whether defendant Cheney was deliberately indifferent to plaintiff's

21  subsequent breathing problem.

22    Finally, in the amended complaint, plaintiff contended that LVN Garcia ordered

23  plaintiff a new inhaler on May 19, 2009.  However, defendants adduced evidence that defendant

24  Cheney ordered plaintiff a new inhaler on May 19, 2009, which plaintiff failed to rebut.  It is

25  undisputed that plaintiff received a breathing treatment around 2:00 p.m., about an hour after the

26  delivery of the mislabeled or used inhaler.  In his deposition, plaintiff conceded that he received a

1   new inhaler the same day, May 19, 2009.  (Pl.'s Depo at 73.)  On these facts, no rational fact-

2   finder could find that defendant Cheney was deliberately indifferent to plaintiff's medical needs.

3            For all of the above reasons, the undersigned recommends that defendant Cheney

4   be granted summary judgment.

5                              iii.  <u>Defendant Dr. Swingle</u>

6            Plaintiff alleges that defendant Dr. Swingle, as CMO, is supposed to make sure

7   that her medical staff does not pass out used medication by checking it out before bringing the

8   medication to the inmates.  (Dkt. No. 13 at 7.)  In his deposition, plaintiff confirmed that he sued

9   defendant Dr. Swingle because she was the supervisor.  (Pl.'s Depo at 67, 72.)  In his opposition,

10  plaintiff contends that he was not provided medical care consistent with medical care provided to

11  nonprisoners,[9] and that defendant Dr. Swingle knew that medical staff was in violation of Article

12  4 of the CDCR Operations Manual, which governs the CDCR nursing services program.  (Dkt.

13  No. 54 at 6.)  Plaintiff alleges he was not the only inmate at HDSP having problems getting

14  medical attention for his asthma.  (<u>Id.</u>)

15           As noted above, where a prisoner names a defendant based on a theory of

16  respondeat superior, the causal link between him and the claimed constitutional violation must be

17  specifically alleged.  There is no liability where there is no evidence of personal participation.

18  <u>Mosher</u>, 589 F.2d at 441.

19           Defendants adduced evidence that defendant Swingle played no role in plaintiff's

20  medical care, treatment, or medication issues.  Plaintiff failed to rebut this evidence.

21           As argued by defendants, defendant Swingle's only involvement as to the

22  allegations of December 23, 2008, was to provide a second level response to plaintiff's appeal on

23  March 11, 2009.  By then, the alleged constitutional violation had already occurred, and there

24  ─────────────

25       [9]  To the extent plaintiff challenges the systemic provision of medical care in prison, such
     claims must be presented through class counsel in <u>Plata v. Schwarzenegger</u>, No. C 01-1351 THE
26  (N.D. Cal.), a class action suit concerning the adequacy of medical care provided throughout the
     California state prison system.

1   was no ongoing constitutional violation for defendant Swingle to prevent.  See Taylor v. List,

2   880 F.2d 1040, 1045 (9th Cir. 1989) (supervisory official liable under Section 1983 if he or she

3   knew of a violation and failed to act to prevent it).  Thus, no reasonable fact-finder would find

4   defendant Dr. Swingle was deliberately indifferent based on his role in ruling on plaintiff's

5   administrative appeal on March 11, 2009.

6          In connection with the May 19, 2009, mislabeled or used inhaler issue, defendants

7   adduced evidence that defendant Dr. Swingle played no role in plaintiff receiving a used inhaler;

8   Dr. Swingle did not know that plaintiff received a used inhaler, and did not have reason to

9   suspect that a used inhaler would be passed out to plaintiff.  (Dkt. No. 47-7 at 3.)  Plaintiff did

10  not rebut this evidence.  Rather, plaintiff relies on Article 4 of the CDCR Operations Manual,

11  which governs the CDCR nursing services program, highlighting key portions.  (Dkt. No. 54-2 at

12  104-07.)  However, none of the highlighted portions, or the balance of Article 4, state that the

13  CMO is in charge of the nursing staff, or is responsible for supervising the nursing staff.  (Id.,

14  passim.)  Defendants adduced evidence demonstrating that as CMO, defendant Dr. Swingle had

15  no authority or supervision over nursing staff, or over the pharmacist or the pharmacy staff.

16  (Dkt. No. 47-7 at 3.)  Rather, the PIC was responsible for all medication procurement and

17  dispensing, and the SRNIII and other nursing supervisory staff were responsible to oversee all

18  medication distribution.  (Id. at 2.)  The RN staff in each clinic was responsible to oversee

19  distribution of medications.  (Id.)  Plaintiff failed to rebut this evidence.

20          Thus, plaintiff failed to establish a link or connection between defendant Dr.

21  Swingle and plaintiff's allegations.  Therefore, defendant Dr. Swingle is not liable under a theory

22  of respondeat superior.  See Monell, 436 U.S. at 658 (rejecting the concept of respondeat

23  superior liability in the section 1983 context and requiring individual liability for the

24  constitutional violation); McClelland v Facteau, 610 F2d 693, 695 (10th  Cir. 1979)

25  ("[Respondeat superior] cannot be used to hold liable under section 1983 superior officers who

26  have no affirmative link with the misconduct").  In his opposition, plaintiff sets forth the three

28

1   prong test used to determine supervisory liability in <u>Adams</u>, 61 F.3d 1537, including a reference

2   to failure to train and supervise subordinates.  (Dkt. No. 54 at 6.)  However, plaintiff failed to

3   evaluate how this test applies to defendant Dr. Swingle, particularly in light of Dr. Swingle's

4   declaration that she held no such supervisory role over defendant Cheney.  Therefore, the court

5   recommends that defendant Dr. Swingle be granted summary judgment.

6                              iv.  <u>Defendant Turner-Gamberg</u>

7                In his deposition, plaintiff confirmed that he sued defendant Turner-Gamberg

8   because she allegedly refused to call medical to inform them that plaintiff had received a used

9   inhaler and needed medical attention, even though plaintiff was yelling for over an hour, and

10   kicking his cell door.  (Pl.'s Depo at 69-71.)  As noted by defendants, plaintiff did not argue this

11   Eighth Amendment issue in his opposition or declaration.  (Dkt. Nos. 54, 54-2, *passim*.)

12                It is undisputed that defendant Cheney delivered the used inhaler to plaintiff

13   around 1:00 p.m. on May 19, 2009.  Although plaintiff claims that defendant Turner-Gamberg

14   did not call medical, defendants adduced evidence demonstrating that on May 19, 2009, at 1:10

15   p.m., defendant Turner-Gamberg called medical to report that plaintiff was given a used asthma

16   pump, and noted that plaintiff was screaming, kicking the door, and throwing a fit.  (Dkt. No. 47-

17   10 at 5.)  Plaintiff was released to walk to medical shortly after 2:00 p.m.  (Dkt. No. 48-1 at 15.)

18   Plaintiff received a breathing treatment shortly thereafter.  (<u>Id.</u> at 19.)  Plaintiff received a new

19   inhaler later that day.

20                Plaintiff did not rebut this evidence.

21                Thus, it is undisputed that defendant Turner-Gamberg called medical about ten

22   minutes after the inhaler was delivered to plaintiff on May 19, 2009.  On this record, no

23   reasonable fact-finder would find defendant Turner-Gamberg was deliberately indifferent to

24   plaintiff's serious medical needs.  The undersigned recommends that defendant be granted

25   summary judgment on plaintiff's Eighth Amendment medical claim.

26   ////

V.  Alleged Fourth Amendment Violation - Defendant Turner-Gamberg

Plaintiff contends that when he and other inmates are being strip-searched for yard, defendant Turner-Gamberg, a female correctional officer, is monitoring plaintiff from the control tower while he is naked, in violation of the Fourth Amendment, and in violation of prison regulations.  Defendants contend that defendant Turner-Gamberg did not physically conduct any strip search of plaintiff, and that her role as control booth officer required observing, at a distance, all inmates on the floor, to ensure the safety and security of floor staff.  In the alternative, defendant contends she is entitled to qualified immunity.

A.  Fourth Amendment

The Fourth Amendment prohibits only unreasonable searches.  Bell v. Wolfish, 441 U.S. 520, 558 (1979); Michenfelder v. Sumner, 860 F.2d 328, 332 (9th Cir. 1988).  The reasonableness of the search is determined by the context, which requires a balancing of the need for the particular search against the invasion of personal rights the search entails.  Bell, 441 U.S. at 558-59 (quotations omitted).  Factors that must be evaluated are the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  Bell, 441 U.S. at 559 (quotations omitted); Michenfelder, 860 F.2d at 332.

In analyzing these factors, the cross-gender nature of the search is a critical consideration.  Byrd v. Maricopa Cnty. Sheriff's Dep't., 629 F.3d 1135, 1143 (9th Cir. 2011) (en banc), cert. denied, 131 S. Ct. 2964 (2011).  It has long been recognized that "the desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity."  York v. Story, 324 F.2d 450, 455 (9th Cir. 1963).  The "litany of cases over the last thirty years has a recurring theme:  cross-gender strip searches in the absence of an emergency violate an inmate's right under the Fourth Amendment to be free from unreasonable searches."  Byrd, 629 F.3d at 1146.

////

////

B.  Qualified Immunity

Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009).  Thus, the undersigned elects to first address the issue of qualified immunity.  If defendant should not be granted qualified immunity, the court will consider the motion on the merits of plaintiff's Fourth Amendment claim.

a. Two-Step Inquiry

Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

In resolving the claim of qualified immunity, the court must determine whether, taken in the light most favorable to plaintiff, defendant Turner-Gamberg's conduct violated a constitutional right, and if so, whether the right was clearly established.  Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller, 576 F.3d at 993.  Courts have discretion to address the two-step inquiry in the order deemed most suitable under the circumstances.  Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94.

Here, the court proceeds to the second step of the inquiry to determine whether plaintiff's Fourth Amendment right to be free from routine cross-gender viewing during strip searches was clearly established in 2009.  Somers v. Thurman, 109 F.3d 614, 622 (9th Cir. 1997)

1  (declined to determine whether Fourth Amendment right to be free from cross-gender strip

2  searches existed because there was no question it was not clearly established).

3                    b. Clearly Established Right

4        In deciding whether the plaintiff's rights were clearly established,
         [t]he proper inquiry focuses on whether "it would be clear to a
5        reasonable officer that his conduct was unlawful in the situation he
         confronted" . . . or whether the state of the law [at the relevant
6        time] gave "fair warning" to the officials that their conduct was
         unconstitutional.

7

8  Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 202).  The

9  inquiry must be undertaken in light of the specific context of the particular case.  Saucier, 533

10 U.S. at 201.

11                   c. Discussion

12       In 1985, the Ninth Circuit considered a claim by male inmates that female officers

13 were viewing them in states of partial or totally nude while dressing, showering, being strip

14 searched, or using the toilet, in violation of their right to privacy.  Grummett v. Rushen, 779 F.2d

15 491, 492 (9th Cir. 1985).  The Ninth Circuit relied on York, 324 F.2d at 450, in which it

16 recognized a right to bodily privacy implicit in the Due Process Clause of the Fourteenth

17 Amendment, and assumed an interest in shielding one's body from members of the opposite sex,

18 protected by the right of privacy.  Grummett, 779 F.2d at 494.  The Ninth Circuit discussed the

19 circumstances in which female officers were observing male inmates.  Id. at 494-96.  Female

20 officers were not assigned to positions requiring unrestricted and frequent surveillance, but rather

21 were in positions requiring only infrequent and casual observation, or observation from a

22 distance.  Id. at 494 (quotation marks omitted).  Female officers did not conduct or observe strip

23 or body cavity searches, with the exception of emergency situations, and the pat-down searches

24 they conducted did not include intimate contact with inmates' bodies and were handled

25 professionally.  Id. at 495 (quotation marks omitted).  The Ninth Circuit concluded that the

26 inmates had not demonstrated that "restricted observations by members of the opposite sex

32

1    [were] so degrading as to require intervention by this court," id., ultimately finding no Fourth or

2    Fourteenth Amendment violation, and affirmed the district court's decision granting summary

3    judgment for prison officials.

4            In 1988, the Ninth Circuit considered a challenge to frequent, routine, cross-

5    gender strip searches on the grounds that they were unreasonable, and that they violated inmates'

6    right to privacy, because they were conducted within the view of female officers.  Michenfelder,

7    860 F.2d at 333.  In addition, the plaintiff challenged the stationing of female officers on shower

8    duty.  Id.  In Michenfelder, the visual body cavity searches at issue took place in the maximum

9    security unit, and were conducted every time an inmate left or returned to the unit.  Id. at 332.

10   Female officers did not conduct strip searches except in emergencies, and they were not routinely

11   present for the searches, but they were stationed in positions controlling cell doors and

12   monitoring the tiers by a video screen.  Id. at 330.  For those controlling cell doors, the searches

13   were visible through a small window; and in the event that female officers monitoring the tiers

14   violated prison policy and closely watched the searches, they would at most have an "indistinct,

15   limited view" through the video monitors.  Id. at 330, 334.  The Ninth Circuit also found that

16   "[e]vidence of female officers' role in shower duty likewise did not establish an inappropriate

17   amount of contact with disrobed prisoners."  Id. at 334.

18           In Michenfelder, the Ninth Circuit recognized "that incarcerated prisoners retain a

19   limited right to bodily privacy," but found that the searches were reasonable, and neither the

20   searches nor the employment of female guards on shower duty violated inmates' right to privacy.

21   Id. at 333-34.  The Ninth Circuit found that the prison's division of responsibilities between male

22   and female guards represented a reasonable attempt to accommodate the tension between

23   inmates' privacy concerns and the prison's internal security needs and equal employment

24   concerns.  Id. at 334.  The court also noted the limited nature of the guards' involvement in the

25   strip searches.  The female guards' observations were made from a control booth's video

26   monitors that provided a limited view of the searches, and "[e]vidence of female officers' role in

1   shower duty likewise did not establish an inappropriate amount of contact with disrobed

2   prisoners." Id.

3            Then, in 1997, the Ninth Circuit considered an inmate's claim that female officers

4   conducting visual body cavity searches on a regular basis and watching him shower while naked

5   violated his rights under the Fourth Amendment. Somers, 109 F.3d at 616.  In Somers, the

6   appellate court noted that this circuit has never held that a prison guard of the opposite sex

7   cannot conduct routine visual body cavity searches of prisoners, or that guards of the opposite

8   sex may not view an inmate showering.  Id. at 620.  The court found that it was not clearly

9   established that a prisoner's legitimate expectation of bodily privacy prohibits cross-gender

10  searches, recognizing that "it is highly questionable even today whether prison inmates have a

11  Fourth Amendment right to be free from routine unclothed body searches by officials of the

12  opposite sex, or from viewing of their unclothed bodies by officials of the opposite sex." Id. at

13  622.  The Ninth Circuit acknowledged its earlier decisions in Grummett, Michenfelder, and

14  Sepulveda[10] might be read to suggest that up close, frequent, and intentional viewing of male

15  prisoners by female officers could violate an inmate's privacy rights, but noted the different

16  direction taken in Jordan v. Gardner, in which an en banc panel of the Ninth Circuit stated that

17  while inmates may have protected privacy interests in freedom from cross-gender strip searches,

18  such interests had not been judicially recognized, and inmates' legitimate expectations of bodily

19  privacy from persons of the opposite sex were extremely limited.[11]  Somers, 109 F.3d at 620

20  _____

21      [10]  In Sepulveda v. Ramirez, 967 F.2d 1413, 1415 (9th Cir. 1992), the Ninth Circuit
    considered a female parolee's claim that a male parole officer violated her right to bodily privacy
22  by entering the bathroom stall and observing her provide a urine sample while she was partially
    nude and seated on the toilet.  The Ninth Circuit found that the officer was not entitled to
23  qualified immunity because the female parolee's right to bodily privacy was clearly established
    by 1988, and stated that parolees' constitutional rights are "more extensive than those of
24  inmates." Id., 967 F.2d at 1415-16.

25      [11]  In Jordan, the Ninth Circuit did not reach the female inmates' Fourth Amendment
    claims because it found the cross-gender searches by male officers violated the Eighth
26  Amendment.  Id., 986 F.2d at 1524-25.  However, in discussing the Fourth Amendment, it
    declined to assume that because the searches caused immense anguish, they necessarily violated

(citing <u>Jordan v. Gardner</u>, 986 F.2d 1521, 1524-25 (9th Cir. 1993) (*en banc*)) (quotation marks omitted).

Years later, in 2011, in <u>Byrd</u>, the Ninth Circuit changed course, and held that a non-emergency strip search of a male pretrial detainee by a female cadet was unreasonable in violation of the Fourth Amendment.  In <u>Byrd</u>, a female cadet conducted a cross-gender strip search that involved:

> touch[ing the inmate's] inner and outer thighs, buttocks, and genital area with her latex-gloved hand through very thin boxer shorts. She moved his penis and scrotum in the process of conducting the search. The scope of this intrusion totally thwarted any desire on [the inmate's] part to 'shield [his] unclothed figure from [the] view of strangers . . . of the opposite sex . . .

<u>Byrd</u>, 629 F.3d at 1141 (quoting <u>York</u>, 324 F.2d at 455).  The court found that the scope of this intrusion far exceeded previously sanctioned searches, and weighed in favor of a finding of unreasonableness.  <u>Byrd</u>, 629 F.3d at 1141.  The court also found that the manner of the search in <u>Byrd</u> was unreasonable.  The female cadet, dressed in a white t-shirt and jeans, was identified only by a name on the back of her t-shirt.  <u>Id.</u> at 1143.  At least one person videotaped, and ten to fifteen non-participating officers watched, the strip search.  <u>Id.</u>  Although the court found that the justification for, and the place of, the search weighed in favor of a finding of reasonableness, the first two factors compelled a conclusion of unreasonableness because they were so extreme.  <u>Id.</u>

The finding of unreasonableness in <u>Byrd</u> contrasts with the conclusions reached in <u>Grummett</u>, 779 F.2d 494-96, and <u>Michenfelder</u>, 860 F.2d 332.  In <u>Grummett</u>, the Ninth Circuit found that prison policies that allowed female correctional officers to view male inmates in states of partial or total nudity while dressing, showering, being strip searched, or using toilet facilities did not violate the Fourth or Fourteenth Amendment.  <u>Grummett</u>, 779 F.2d at 494-96.  In <u>Michenfelder</u>, the Ninth Circuit upheld a strip search policy that called for visual body cavity

the Fourth Amendment.  <u>Id.</u>

searches, when an inmate left or returned to a unit, and when an inmate traveled under escort

within the unit, including leaving and returning from sick call, recreation, disciplinary hearings,

and visits.  Michenfelder, 860 F.2d at 332.  The Ninth Circuit upheld the policy despite the

plaintiff's argument that the searches were conducted in the view of female correctional officers

and visitors.  Id. at 333-34.  In Michenfelder, the court held that strip searches that involve

infrequent or casual observation by members of the opposite sex, or where observation is from a

distance, do not unreasonably infringe upon the prisoner's privacy rights, and cited the interest in

providing equal employment opportunities to women and the security interest in deploying

available staff effectively as valid penological interests.  Id. at 334.

        In Byrd, the Ninth Circuit distinguished Grummett by noting that the female

officers in Grummett were not assigned to positions in which they conducted or observed strip or

body cavity searches, and they did not have intimate contact with the inmates' bodies.  Byrd, 629

F.3d at 1142.  The Ninth Circuit distinguished Michenfelder by noting that "'infrequent and

casual observation, or observation at [a] distance, . . . are not so degrading as to warrant court

interference.'"  Byrd, 629 F.3d at 1142 (quoting Michenfelder, 860 F.2d at 334).

        The Byrd decision sharply departed from Somers, holding that non-emergency

cross-gender strip searches are unconstitutional as a matter of law.  Byrd, 629 F.3d at 1147.

However, the Byrd decision issued in 2011, and the alleged monitoring of plaintiff during strip

searches by defendant Turner-Gamberg occurred in 2009.  In 2009, the pre-existing law did not

give defendant fair warning that it was unlawful to occasionally conduct routine cross-gender

strip searches, and it necessarily follows that it was not clearly established that the less direct

participation of providing security coverage from the control booth during cross-gender strip

searches, was unconstitutional.[12]

_____

        [12]  Plaintiff also alleged that defendant Turner-Gamberg's conduct in viewing the strip
searches violated prison regulations.  Applicable California regulations prevent cross-gender
unclothed body searches "except under emergency conditions with life or death consequences."
See Cal. Code Regs. tit. 15 § 3287(b) (2002).  First, it is not clear that observing cross-gender

1    Therefore, the undersigned recommends that defendant Turner-Gamberg be

2    granted qualified immunity on plaintiff's Fourth Amendment claim.

3    VI.  Remaining Federal Claims - Defendant Turner-Gamberg

4    Plaintiff alleges that defendant Turner-Gamberg turned off the hot water to the

5    day room in section A on two separate occasions.  On May 19, 2009, plaintiff alleges defendant

6    Turner-Gamberg allegedly told plaintiff that if he didn't "kiss her ass" he "got nothing coming,"

7    which plaintiff states meant that plaintiff would not get medical attention because plaintiff was

8    asking for a breathing treatment and had been given a used inhaler.  Plaintiff claims that

9    defendant Turner-Gamberg searched his cell in retaliation for plaintiff filing grievances, that she

10   refused to allow him to shower, and that she told plaintiff she would tell a correctional officer to

11   spit in plaintiff's food if he did not stop kicking the door.

12   A.  Conditions of Confinement

13   The treatment a prisoner receives in prison and the conditions under which he is

14   confined are subject to scrutiny under the Eighth Amendment.  Helling v. McKinney, 509 U.S.

15   25, 31 (1993).  The Constitution does not mandate comfortable prisons, but neither does it permit

16   inhumane ones.  Farmer, 511 U.S. at 832.  A prison official violates the Eighth Amendment

17   when two requirements are met:  (1) the deprivation alleged must be, objectively, sufficiently

18   serious, and (2) the prison official possesses a sufficiently culpable state of mind.  Id. at 834.  In

19   determining whether a deprivation is "sufficiently serious" within the meaning of the Eighth

20   Amendment, the court must consider "the circumstances, nature, and duration" of the

21   deprivation.  Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).  "Prison officials have a duty

22   to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care,

23   and personal safety."  Id. (citations omitted).  "The more basic the need, the shorter the time it

24   _____

25   body searches from a distance violates the regulations.  Second, state officials sued for
     constitutional violations do not lose their qualified immunity merely because their conduct
     violated state regulations.  Davis v. Scherer, 468 U.S. 183, 194 (1984); Cousins v. Lockyer, 568

26   F.3d 1063, 1070 (9th Cir. 2009); Somers, 109 F.3d at 621.

can be withheld." Hoptowit v. Ray, 682 F.2d 1237, 1259 (9th Cir.1982), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472 (1995). "More modest deprivations can also form the objective basis of a violation, but only if such deprivations are lengthy or ongoing." Johnson, 217 F.3d at 731 (citation omitted).

### i. Deprivation of Hot Water

Plaintiff alleges that he was deprived of hot water for an unspecified period of time on two separate occasions. However, plaintiff failed to demonstrate how this deprivation on two occasions posed a substantial risk of harm, or denied him one of life's minimal necessities. Indeed, he admitted in his deposition that he had access to hot water in his cell, it just wasn't hot enough to make coffee or soup. (Pl.'s Depo at 88.) Plaintiff has alleged a temporary inconvenience, not a "sufficiently serious" deprivation. See Hartsfield v. Vidor, 199 F.3d 305, 309-10 (6th Cir. 1999) (finding no constitutional violation where plaintiff was not allowed to use toilet, was allowed to sit in his own urine, and was not provided with fresh drinking water for two 8-hour periods; noting that the court had previously held that deprivations of fresh water and access to a toilet for 20 hours was harsh, but not cruel and unusual punishment); Holloway v. Gunnell, 685 F.2d 150, 156 (5th Cir.1982) (plumbing problem that resulted in the cutoff of water to cell for several hours did not rise to Eighth Amendment violation). Thus, the undersigned recommends that defendant Turner-Gamberg be granted summary judgment on this claim.

### ii. Alleged Refusal to Allow Plaintiff to Shower

Plaintiff alleges that on August 23, 2009, defendant Turner-Gamberg refused to allow him and his cellmate to shower. Defendant Turner-Gamberg adduced evidence that she was required to release inmates to shower in a random fashion, and that her ability to release other inmates to shower hinged on the number of inmates who wanted to shower, as well as how long each inmate took to shower. If she was unable to get to every inmate on her watch, the third watch officers would finish allowing inmates to shower. Plaintiff failed to rebut this evidence.

////

1    Plaintiff alleges a temporary inconvenience, not a "sufficiently serious"

2    deprivation.  The undersigned recommends that defendant be granted summary judgment on this

3    claim.

4    B.  Alleged Retaliatory Cell Searches

5    Plaintiff raised this claim in his administrative appeal no. HDSP 09-1242.  (Dkt.

6    No. 13 at 41.)  In Claim III of the amended complaint, plaintiff raised this claim by citing to

7    appeal no. HDSP 09-1242.  (Dkt. No. 13 at 7.)  In this appeal, plaintiff stated:  "she has the

8    correctional officers on second watch searching my cell and taking my personal property from

9    me."  (Dkt. No. 13 at 44.)

10    "Within the prison context, a viable claim of First Amendment retaliation entails

11    five basic elements:  (1) An assertion that a state actor took some adverse action against an

12    inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the

13    inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a

14    legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

15    In his opposition, plaintiff does not include factual allegations supporting this

16    claim, or provide evidence demonstrating that defendant engaged in such searches.[13]  In his

17    deposition, plaintiff could not identify the date of the alleged retaliatory cell search.  (Pl.'s depo

18    at 100.)  Plaintiff claimed he had specific witnesses "for a lot of incidents" (id.), but plaintiff

19    failed to provide any declarations as to the cell search issue.

20    On the other hand, defendant adduced evidence demonstrating that unless she saw

21    something specific such as unauthorized items being passed under a cell, she did not order any

22

23    [13]  Rather, plaintiff appears to claim that the partial granting of appeal HDSP-09-1242
      proves that defendant Turner-Gamberg acted unprofessionally, and that he would have been
24    charged with a misdemeanor for filing a false report "if all that was stated [in the appeal] wasn't
      true."  (Dkt. No. 54 at 7-8.)  Although the appeal was "partially granted" at the first and second
25    levels of review, it was to allow inquiry as a staff complaint.  (Dkt. No. 13 at 48, 50.)  After the
      inquiry, prison officials determined that staff did not violate CDCR policy.  (Id.)  Plaintiff's third
26    level appeal was denied.  (Id. at 45-46.)

cell searches or get involved in cell searches.  She denied ordering a retaliatory cell search or conducting a retaliatory cell search of plaintiff's cell.

Factual allegations must be enough to raise a right to relief above the speculative level.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).  A complaint must proffer "enough facts to state a claim for relief that is plausible on its face."  Id. at 1974.

This court finds that plaintiff's allegation of retaliatory cell searches is too vague and conclusory to state a cognizable civil rights claim.  His administrative appeal offers no factual support, and plaintiff failed to support this claim in his deposition, or in his opposition.  Defendants adduced evidence demonstrating defendant Turner-Gamberg had limited involvement with cell searches, and plaintiff adduced no evidence to the contrary.  Accordingly, the undersigned recommends that defendant Turner-Gamberg be granted summary judgment on this claim.

C.  Verbal Harassment

Plaintiff also alleges that he has been verbally harassed or threatened by defendant Turner-Gamberg, and complains that she engaged in "unprofessional conduct."  For example, she allegedly threatened to withhold medical attention if he did not "kiss her ass," (pl.'s depo at 70-71), and that she threatened to tell a correctional officer to spit in plaintiff's food if he didn't stop kicking his cell door.  Defendant Turner-Gamberg denies making the statements attributed to her.

"Verbal harassment or abuse . . . is not sufficient to state a constitutional deprivation[.]"  Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) (allegations that correctional counselor told plaintiff that he would transfer him to a higher custody status unit if he tried to go to the law library and that he would be sorry if he filed a class action suit were not actionable under § 1983); Machin v. Costas, 2009 WL 3839325, at *15 (S.D. Cal. Nov. 16, 2009) (defendant's harsh or unsympathetic comments in response to plaintiff's pain do not, without more, rise to the level of deliberate indifference).

Plaintiff's allegations concerning defendant Turner-Gamberg's alleged verbal comments fail to state a cognizable civil rights claim.  As set forth above, defendants adduced evidence that defendant Turner-Gamberg timely notified medical that plaintiff had received a used asthma pump.  Defendant denies she told plaintiff that she would tell an officer to spit in plaintiff's food, and plaintiff adduced no evidence demonstrating that an officer actually spit in his food.  Thus, even assuming defendant Turner-Gamberg made these statements, they are mere threats which do not rise to the level of a constitutional violation.  Moreover, allegations that defendant Turner-Gamberg engaged in "unprofessional conduct" are also insufficient to state a cognizable civil rights claim.  Thus, the undersigned recommends that defendant be granted summary judgment on this claim.

VI.  <u>State Law Claims</u>

In plaintiff's amended complaint, plaintiff states that "this complaint is based on medical negligence." (Dkt. No. 13 at 13.)  Plaintiff also claims that defendants Cheney and Turner-Gamberg acted in "medical negligence" on May 19, 2009.  (<u>Id.</u> at 7.)  Plaintiff does not affirmatively state that he filed a tort claim.  (<u>Id.</u>, *passim*.)

Defendants contend that plaintiff failed to file a timely claim for any negligence or medical negligence claims arising from the instant action, and that his statement that "there is no need for government claims," (dkt. no. 54 at 10), suggests that plaintiff concedes these claims should be dismissed.  Defendants argue that the documents plaintiff provided in opposition do not demonstrate plaintiff filed a timely claim that was rejected.

In opposition, plaintiff does claim that he is not pursuing this matter in state court so "there is no need for government claims." (Dkt. No. 54 at 10.)  However, plaintiff then states that he attached "all claims filed at HDSP on issues concerning HDSP seeing that he does not remember which claim number it is.  (See Exhibit E.)" (Dkt. No. 54 at 10.)  Exhibit E to plaintiff's declaration are copies of letters from the VCGCB addressing 23 different claims filed by plaintiff.  (Dkt. No. 54-2 at 109-38.)  Five of the letters are rejections.  (<u>Id.</u> at 121, 123, 124,

1    134, & 136.)

2          Under the California Tort Claims Act ("Act"), set forth in California Government

3    Code sections 810 et seq., a plaintiff may not bring a suit for monetary damages against a public

4    employee or entity unless the plaintiff first presented the claim to the California Victim

5    Compensation and Government Claims Board ("VCGCB" or "Board"), and the Board acted on

6    the claim, or the time for doing so expired.  "The Tort Claims Act requires that any civil

7    complaint for money or damages first be presented to and rejected by the pertinent public entity."

8    Munoz v. California, 33 Cal. App. 4th 1767, 1776 (1995).  The purpose of this requirement is "to

9    provide the public entity sufficient information to enable it to adequately investigate claims and

10   to settle them, if appropriate, without the expense of litigation."  City of San Jose v. Superior

11   Court, 12 Cal. 3d 447, 455 (1974) (citations omitted).  Compliance with this "claim presentation

12   requirement" constitutes an element of a cause of action for damages against a public entity or

13   official.  State v. Superior Court (Bodde), 32 Cal. 4th 1234, 1244 (2004).  Under California

14   Government Code § 910, plaintiff is required to show, *inter alia*, the date, place, and other

15   circumstances of the occurrence or transaction which gave rise to the claim; a general description

16   of the injury, damage or loss, and the names of the public employees causing the injury.  Id.

17         Consistently, federal courts require compliance with the CTCA for pendant state

18   law claims that seek damages against state public employees or entities.  Willis v. Reddin, 418

19   F.2d 702, 704 (9th Cir. 1969); Mangold v. California Public Utilities Commission, 67 F.3d 1470,

20   1477 (9th Cir. 1995).  State tort claims included in a federal action, filed pursuant to 42 U.S.C.

21   § 1983, may proceed only if the claims were first presented to the state in compliance with the

22   claim presentation requirement.  Karim-Panahi v. Los Angeles Police Department, 839 F.2d 621,

23   627 (9th Cir. 1988).

24         A failure to present an administrative claim is fatal to a cause of action under this

25   Act.  Rivera v. City of Merced, 2006 WL 3349576, at *4 (E.D. Cal. 2006) (citing Bodde, 32 Cal.

26   4th at 1239.  Under California law, a failure to file a required claim warrants a grant of summary

1   judgment.  TrafficSchoolOnline, Inc. v. Clarke, 112 Cal. App.4th 736, 738, 5 Cal. Rptr.3d 408

2   (2003).  Plaintiff has the burden of showing either "satisfaction of the statutory prerequisites or

3   sufficient facts to justify noncompliance on the ground of excuse, waiver, or estoppel."  Rivera,

4   2006 WL 3349576 at *4 (citing Bodde, 32 Cal.4th at 1239) (essential element of cause of

5   action); see also 1 CEB California Government Tort Liability Practice § 5.18 (2006).

6           Plaintiff has not met that burden here.  None of the VCGCB documents

7   demonstrate the nature of the underlying claim, and plaintiff did not provide copies of the

8   underlying claims he did raise with the VCGCB.  Plaintiff concedes that he does not recall which

9   claim number exhausts the state law claims raised herein.  Thus, the court cannot discern whether

10  the claims were timely filed, or whether the VCGCB rejections addressed any of the state law

11  claims raised herein.  Because plaintiff has the burden to show that he complied, or was excused

12  from complying with the claim presentation requirement, the undersigned recommends that

13  plaintiff's state law claims be dismissed without prejudice.

14  VII.  Qualified Immunity

15          Alternatively, defendants contend they are entitled to qualified immunity.  The

16  court recommended that defendant Turner-Gamberg be granted qualified immunity on plaintiff's

17  strip search claim, but found that all of plaintiff's remaining claims lack merit.  Thus, the court

18  need not reach the defense of qualified immunity on such remaining claims.  Cf. Saucier, 533

19  U.S. at 201 (discussing two parts of qualified immunity analysis, including inquiry as to whether

20  facts establish violation of constitutional right).

21  VI.  Conclusion

22          Accordingly, IT IS HEREBY RECOMMENDED that defendants' March 23,

23  2012 motion for summary judgment (dkt. no. 47) be granted as follows:

24          1.  Defendant Turner-Gamberg be granted summary judgment on plaintiff's strip

25  search claim on the grounds of qualified immunity;

26          2.  Defendants Turner-Gamberg, Mitchell, Cheney, and Swingle be granted

1  summary judgment on plaintiff's remaining federal claims; and

2           3.  Plaintiff's state law claims be dismissed without prejudice.

3           These findings and recommendations are submitted to the United States District

4  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

5  days after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

8  objections shall be filed and served within fourteen days after service of the objections.  The

9  parties are advised that failure to file objections within the specified time may waive the right to

10  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11  DATED:  February 27, 2013

13  _____

14  KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

15  edwa3461.msj